Casper *v.* State Workmen's Insurance Fund et al.,
Appellants.

Argued April 18, 1938.

Be-fore Keller, P. J., Cunningham, Stadtfeld, Parker and Rhodes, JJ.

*S. H. Torchia,* with him *Charles J. Margiotti,* Attorney General and *John T. J. Brennan,* for appellants.

*C. Randolph Myers,* for appellee.

Opinion by Cunningham, J., June 29, 1938:

This appeal, taken and prosecuted by the insurance carrier for the employer of the claimant, is from a judgment entered upon an award for additional compensation, to begin January 14, 1936, and continue, within the limitations of our Workmen's Compensation Act of June 2, 1915, P. L. 736, 77 PS §1 et seq., and its amendments, until claimant's disability ceases or changes. As the judgment is based upon a misinterpretation of section 306, 77 PS §§511-513, and section 413, 77 PS §§771-772, as construed by our Supreme Court and by this court, it must be reversed. Aside from the technical question hereinafter considered, the fundamental error of the compensation authorities and the court below lies in their failure to distinguish between "disability" from an injury, as that term is used in

paragraphs (a) and (b) of section 306, as amended April 13, 1927, P. L. 186, and the extent of a "permanent injury," compensable under paragraph (c).

In the course of his employment on November 25, 1931, claimant met with an accident which necessitated the amputation of his right arm three inches above the elbow. An agreement was executed and approved providing for the payment of compensation, under section 306(c), at the rate of $14.94 per week, for the definite period, as fixed by that paragraph, of 215 weeks, "for the loss of an arm." This period expired January 14, 1936, and the entire amount of compensation provided for in the agreement was promptly paid.

About a month after the expiration of that definite period, viz., on February 13, 1936, the claimant filed with the board the petition which gave rise to the present controversy. It was filed specifically under section 413, as amended April 13, 1927, P. L. 186, and prayed for a review of the terminated compensation agreement. The petition contained no averment, or even suggestion, that the agreement had been procured by the "fraud, coercion, or other improper conduct of a party, or was founded upon a mistake of law or of fact." The sole ground upon which the review was sought was thus stated: "Compensation was awarded to me for partial disability, while as a matter of fact I am permanently and totally disabled. ...... My physical condition is such that, as the result of the accident which is the basis of my compensation claim, I am permanently and totally disabled."

These averments clearly brought the petition under the second paragraph of section 413, 77 PS §772, as one for additional compensation by reason of an increase in disability. It should also be noted that the statement: "Compensation was awarded to me for partial disability," was not true. Claimant's counsel knew there had been no "award" and that the agreement

was not for "partial disability," compensable under section 306(b), but "for all disability" whether partial, total, or no disability at all, resulting from the loss of his client's arm, as specifically provided for in paragraph (c) of section 306. Nor was there any intimation in the petition that any member or organ of claimant's body, other than his right arm, had been injured in or by the accident, causing a disability separate from and in addition to the disability normally following from the amputation of an arm.

The insurance carrier in its answer requested the dismissal of the petition upon the ground that its consideration was barred by the limitation applicable to the second paragraph of section 413, to the effect that awards or agreements under section 306(c), except in the case of eye injuries, "can only be reviewed, modified, or reinstated during the time such agreement or award has to run"—here, 215 weeks. It was also denied in the answer that the claimant had any injury "beyond the loss of the right arm."

The subsequent course of the proceedings demonstrates that the referee and board either failed to grasp the issues raised by these pleadings, or misapplied such cases as they cited and ignored many other applicable decisions. Each of the defenses set out in the answer was sound.

The referee, after a hearing upon the petition and answer, reached the conclusion, affirmed by the board, that as the petition alleged permanent and total disability it could be filed at any time within 500 weeks after the accident. He cited *Furman v. Standard P. Steel Co. et al.,* 111 Pa. Superior Ct. 44, 169 A. 243, and *Kitchen v. Miller Bros. et al.,* 115 Pa. Superior Ct. 141, 174 A. 919, in support of his ruling.

The Furman case involved an agreement for partial disability under paragraph (b) and has no application whatever to the case at bar. Nor does the Kitchen

case support the conclusion of the referee and board upon this branch of the case. When read with any degree of care, it demonstrates that the present petition should have been filed within the 215 weeks' period in order to confer any jurisdiction upon the board.

The case now before us differs materially upon its facts from the Kitchen case. There, the employee had lost an index finger and also the use of his thumb. Through improper conduct by the representatives of the employer he was induced to sign an agreement for compensation for the 35 weeks' period prescribed for the loss of a first finger, whereas he was entitled to an agreement for an additional period of 60 weeks for the loss of the use of his thumb, or 95 weeks in all. We there held that a petition filed within 95 weeks after the accident was in time. As stated, there is no suggestion of any fraud, improper conduct, or mistake, in the making of the agreement in this case. It covered the full extent of the claimant's injuries and was for the maximum period prescribed by section 306(c) for the amputation of an arm. The effect of the Kitchen case, in so far as the construction of section 413 is concerned, is to limit what was said in *Zupicick v. P. & R. C. & I. Co.,* 108 Pa. Superior Ct. 165, 164 A. 731, relative to "existing" agreements to those for total or partial disability under sections 306(a) and 306(b). The following illustration at pages 146 and 147 of the Kitchen case shows that the petition in the present case was filed too late: "If,—to suppose an extreme case,—the first paragraph of section 413 should, in all cases, be limited to 'existing' agreements, and an employe, who had lost an arm, was induced by the fraud of his employer to sign a compensation agreement, fixing his disability at the loss of a fourth finger, the term of which would be fixed at 15 weeks instead of the 215 weeks to which he was entitled, unless he moved to have the agreement set aside within the 15 weeks the agreement had to run,

he would be without a remedy to set aside the fraud. This could not have been intended by the framers of the act. We hold, rather, that he would be in time if he acted within 215 weeks, the term fixed by section 306(c) as the period of compensation for the loss of the member which he actually suffered and for which compensation should have been allowed. We accordingly restrict the language used in our opinion in the Zupicick case, with reference to 'existing' agreements, to compensation agreements under sections 306(a) and 306(b)."

Upon the appeal of the carrier to the common pleas its exceptions were dismissed and judgment entered upon the award. The court below did not enter into a discussion of the issues, but adopted the findings of fact and conclusions of law of the board, adding, however, upon the question now under consideration, the case of *Tinsman v. Jones & Laughlin S. Corp.*, 118 Pa. Superior Ct. 516, 180 A. 175, as supporting the position of the board. That case was also one in which the claimant not only suffered the amputation of a thumb, but, by reason of the spreading of infection into his wrist and forearm, had a permanent disability in those members separate, apart and distinct from the loss of the thumb, which was not included, by reason of a mutual mistake, in the preparation of the compensation agreement. The facts of that case clearly distinguish it from the present. So also, in *Bencho v. Glen Alden Coal Co.*, 121 Pa. Superior Ct. 533, 184 A. 563, cited below, the issue was whether a final receipt had been founded upon a mistake of fact; that case has no application here.

It is idle to argue, as does counsel for the claimant, that the agreement "was drawn to cover a case of total or partial disability as the case might be" and that it was founded upon a mistake of fact. There is not a scintilla of evidence upon this record indicating that any mistake existed at the time the agreement was executed, nor was it an open agreement, as asserted in

behalf of the claimant. It was an agreement for a definite period of 215 weeks and provided compensation for one of the *permanent injuries* specified in section 306(c). The citation of decisions dealing with questions arising under open agreements, or relating to the modification of agreements or the setting aside of final receipts, where it was alleged they had been procured by fraud or were founded upon mistakes of law or of fact, merely adds to the confusion so apparent in this case.

We might conclude this opinion at this point and reverse the judgment upon the ground that claimant's petition for review was filed too late, but, as the compensation authorities and the court below have ignored the leading case in which our Supreme Court construed paragraph (c) of section 306, in its relation to paragraphs (a) and (b), and laid down the principles of law applicable to the questions here involved, we have concluded to point out why this judgment could not be affirmed even if the petition had been filed in time.

The question before the referee and board was not whether the claimant was prevented from working by reason of his physical condition, nor did it relate to the extent of his disability. It was whether he had a disability, distinct and separate from and over and above the disability usually and normally incident to the loss of an arm, attributable to the destruction or diseased condition of other parts of his body, and, if so, whether such destruction or disease was caused by the loss of his arm.

The first sentence of the first finding of the referee indicates that he started out under an obvious misconception. It reads: "This is a petition for review filed by the claimant, Adam Casper, in which he alleges that compensation was awarded him for partial disability and alleges that he is permanently and totally disabled." The referee failed to note from the record before him

that the agreement referred to in the petition was not one for "partial disability" under paragraph (b), but an agreement under paragraph (c) covering any and all disability incident to the loss of the arm, and that the question before him was not whether any partial disability which claimant suffered had become total, but whether any part of claimant's body, other than his right arm, had been so affected, as a direct result of the permanent injury, as to cause a disability separate and distinct from the disability ordinarily attributable to the amputation of an arm.

It seems to have become necessary to restate the principles clearly defined in *Lente v. Luci,* 275 Pa. 217, 119 A. 132. In interpreting paragraph (c) of Section 306 our Supreme Court there said: "Paragraph (c) fixes the total compensation for permanent injuries to certain parts of the body. Under it must be considered all disability 'resulting from' or related to permanent injuries, and the compensation for such injuries shall be 'exclusively' as therein provided. It will be noted the governing feature in this paragraph is a *permanent injury,* while in the former paragraphs the governing feature is a *disability* from an injury. In paragraph (c), the right to compensation for the consequential feature 'all disability,' no matter in what degree, is measured by the extent of the injury, i. e., so much money during a given period for the loss of a hand, arm, foot, leg or eye, respectively. In other words, this legislative mandate fixed the amount to be paid in such cases without considering, but including, all incapacity to labor that may be connected therewith, whether such incapacity be total, partial or no incapacity at all." Further, on page 220 it is said: "The compensation mentioned is restricted by precise language, regardless of the fact that a permanent injury might otherwise affect capacity to work. The standard thus fixed is in the nature of compensation for the damage resulting

from the loss of the members there named, without regard to personal capacity to labor or loss of earning power: *Kerwin v. American Express Co.*, 273 Pa. 134."

With relation to compensation for the destruction or affection of organs, or parts of the body, other than the member in question, it was said, page 221: "As stated, section 306[c] includes all disability emanating from or connected with a permanent injury to the member mentioned, but it must not be understood that compensation will be denied if the physical structure of the body, distinct from the member, is affected by such permanent injury. Compensation may be made for an injury to, destruction or affection of, other organs or parts of the body produced by the permanent injury, causing a disability separate, apart and distinct from that mentioned in paragraph (c). This may be under paragraph (b), or, if total disability, under paragraph (a), as, for illustration, a latent tubercular condition in another part of the body becoming active through the permanent injury; such condition presents a conception far different from that arising out of all disability resulting from permanent injury from the loss of a foot, occasioned by the destruction of a member of the body mentioned in (c). Under the latter, the compensation is fixed; it provides for a single and sole method for the specific injury, regardless of working capacity, and no other scale or standard can be adopted. But, in these cases, where it is claimed that some other part of the body is affected, it must *definitely* and *positively* appear that it is so affected, as a direct result of the permanent injury; the causal connection must be complete, and, further, the disability must be separate and distinct from that which normally follows an injury under paragraph (c), and must endure beyond the time therein mentioned. There must be a *destruction, derangement,* or *deficiency* in the organs of the other parts of the body. It does not include *pain, annoyance, in-*

*conveniences,* disability to work or anything that may come under the term 'all disability,' or normally resulting from the permanent injury." (Italics supplied)

The case of *Clark v. Clearfield Opera House Co.,* 275 Pa. 244, 119 A. 136, is an apt illustration of the application of the principles just quoted. In that case there was not only an ununited fracture of the neck of the femur, rendering the leg useless, but also the destruction of the hip joint and parts above it.

Another illustration will be found in our case of *Gardner v. Pressed Steel Car Co. et al.,* 122 Pa. Superior Ct. 592, 186 A. 410, where a piece of a broken chain struck claimant on the head, destroying one of his eyes and also inflicting an injury to the left lobe of his brain, which lighted up and aggravated a latent dementia praecox.

When the legal principles announced in *Lente v. Luci,* supra, are applied to the testimony on this record, it is clear that it supports the findings of the compensation authorities to the effect that claimant's inability to labor is not alone due to the loss of his arm. The medical experts—Dr. H. A. Collins, called by the claimant, and Dr. Edward Pardoe, who testified for the carrier—agree that, in addition to the loss of his arm, claimant has lost weight, has a weak heart, shortness of breath and a cough. They also agree that the atrophy of the muscles and nerves in the stump and right shoulder of claimant, and the pain of which he complains in that region, are normal results of the amputation.

We are unable, however, to find any competent evidence supporting the further conclusion of the referee and board that the diseased condition of claimant's heart and lungs resulted from the amputation of his arm. The only testimony submitted on behalf of claimant which has any bearing upon this question is the following excerpt from the testimony of Dr. Collins, who, although he had known claimant and treated his

family before the accident, was not in attendance at the time of the operation and made no examination until the day before the hearing. "A. Well, I found he has lost his right arm three inches above the elbow joint which renders it impossible to apply any kind of an artificial hand. His stump in his shoulder and the muscles in the front and back of the chest are very much atrophied or fallen away. He complains of pain in his shoulder and back of his chest. This is in all probability due to the atrophy of the nerves that have been severed there at his elbow joint. I find he is very much emaciated, he has fallen away a whole lot. Q. Well, would that condition be traceable to this accident? A. That part of it, and he has a very weak heart. Q. Would the heart be affected by the accident and subsequent suffering? A. If he was very much shocked at the time it *could* be. Q. Well, in an accident such as to result in the loss of an arm, wouldn't he naturally suffer severe shock? A. Yes, he would naturally suffer severe shock in a case like that. Q. Doctor, will you state whether or not, in your opinion, Adam Casper is able to follow any occupation or do any work which would result in his making a livelihood? A. I wouldn't know of anything that he could do. Q. It is your opinion that he cannot follow any gainful occupation? A. No. Q. And is it your opinion, doctor, that this condition was brought about totally by the accident? A. I think so, yes." The witness admittedly had no knowledge whether claimant suffered from any shock other than that normally accompanying the amputation of an arm, and the suggestion that the heart condition present when the witness made his examination had been caused or aggravated by the accident, and the pain and suffering attendant upon the operation, is a mere assumption. All the witness said was: "*If* he was very much shocked at the time it *could*" have affected his heart.

There was a difference of opinion between the physicians upon the question of causal connection. Dr. Pardoe, testifying with relation to the results of his examination of claimant shortly before the hearing, said: "First, he lost his right upper limb through accident; second, he stated that no other part of his body was injured at that time; third, idleness and advancing years, together with anthracosis have brought very gradual cardiac decompensation; fourth, shortness of breath and cough which are his principal complaints and the disabling factors and are not directly connected with the traumatism sustained; fifth, he is unable to do heavy manual labor." Even if we disregard the opinion of Dr. Pardoe, the testimony of Dr. Collins does not meet the test laid down in the Lente case, viz., "where it is claimed that some other part of the body is affected, it must *definitely* and *positively* appear that it is so affected as a *direct result* of the permanent injury; the causal connection must be complete." (Italics supplied)

We are all of opinion that claimant has failed to show by competent evidence that he is entitled to any compensation in addition to that already paid him for the loss of his arm.

Judgment reversed and here entered for appellants.