## McClelland *v.* Baltimore and Ohio Railroad Company, Appellant.

Argued April 19, 1939.

Before KELLER, P. J., CUN-
NINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and
HIRT, JJ.

*John E. Evans, Jr.,* of *Margiotti, Pugliese, Evans & Buckley,* for appellant.

*William D. Markel,* for appellee.

OPINION BY CUNNINGHAM, J., September 29, 1939:

It is not controverted by the appellant employer in this workmen's compensation case that the claimant, while in the course of his employment as one of its trackmen, suffered an accidental injury to one of his feet on March 31, 1933.

In an open agreement for compensation for total disability, at the rate of $11.07 per week, from April 8, 1933, the accident was thus described: "Rail rolled on left foot, mashing same."

In a supplemental agreement, dated February 10, 1934, it was recited that compensation had been paid to December 22, 1933, "at which time a final settlement receipt was executed," but, as claimant was then unable to resume his employment, the parties agreed that compensation should be continued "until the requirements of [the statute] have been met and fully satisfied."

Under this agreement compensation was paid until September 4, 1936,—in an aggregate amount of $1970.46 and for a total period of 176-2/7 weeks.

In the meantime—August 26, 1936,—the employer filed its petition for termination upon the ground that claimant had "ceased to suffer any disability which results from his accident," but "is suffering disability from a condition which is not caused by the said accident." These averments were denied by the claimant in his answer.

The contention of the employer upon the issue thus framed was that claimant's injury had resolved itself into the "permanent loss of the use of [his] foot," within the meaning of Section 306(c) of our Work-

men's Compensation Act of June 2, 1915, P. L. 736, as further amended by the Act of April 13, 1927, P. L. 186, 77 PS §513; that the compensation fixed by the statute "for all disability resulting from [this] permanent injury" is "sixty-five per centum of wages during one hundred and fifty weeks"; and that as claimant had been paid at that rate for 176-2/7 weeks the "requirements of the statute" had been more than "met."

When the petition and answer came on for hearing before a referee on March 9, 1937, the employer (having the burden of proof) sought to sustain the averments of its petition by the testimony of Dr. Paul R. Seibert; claimant testified in his own behalf and called Drs. R. M. Christie, J. O. Donaldson and J. M. Dunkle.

The referee's principal finding of fact was that claimant while "suffering with a congenital neurological stigmata due to his physical makeup, he sustained an injury to his left foot which hastened his disability, and as a result of which he is now totally disabled." An order dismissing the employer's petition was entered.

No finding was made upon the issue framed by the pleadings and testimony—whether the use of the foot had been permanently lost.

The board, upon the employer's appeal, reviewed the testimony taken by the referee, affirmed his finding of total disability, and added its own additional finding that "the testimony is unanimous that the claimant is now suffering the loss of the industrial use of his left foot."

For the purposes of this appeal, the action of the board in affirming the dismissal of the petition to terminate may properly be considered as an award under Section 306(a) for total disability for a possible additional period of 323-5/7 weeks—a total of 500 weeks. The judgment entered by the court below in favor of the claimant, and from which the appeal now before

us was taken by the employer, was entered upon that basis.

That there was competent testimony before the referee sustaining findings that the use of claimant's foot had been lost and that he was totally disabled at the date of the hearing is not questioned by counsel for appellant. His contention is that there is no competent evidence upon this record of a "destruction, derangement or deficiency" of any organs in any part of claimant's body, other than his left foot, causing any disability, as a direct result of the permanent injury, "separate, apart and distinct" from the disability normally flowing from the loss of the use of his foot. In other words, he contends that whatever "pain, annoyance and disability to work," this record discloses claimant is suffering was included under the phrase "all disability," as used by the legislature in the first sentence of paragraph (c) of Section 306, and has been fully compensated.

It is evident that the board acted under the mistaken impression that if there was merely proof that the use of the foot had been lost and that claimant was totally disabled an award under paragraph (a) for a potential period of 500 weeks could be justified. In thus acting the board ignored the express language of paragraph (c) as construed by our Supreme Court in *Lente v. Luci*, 275 Pa. 217, 119 A. 132; *Bausch v. Fidler*, 277 Pa. 573, 121 A. 507; *Clark v. Clearfield Opera House Co. et al.*, 275 Pa. 244, 119 A. 136; and by this court in *O'Donnell v. S. Fayette Twp. School Dist. et al.*, 105 Pa. Superior Ct. 488, 161 A. 887; *Casper v. State Workmen's Insurance Fund et al.*, 132 Pa. Superior Ct. 96, 200 A. 186; *Croll v. Miller et al.*, 133 Pa. Superior Ct. 448, 2 A. 2d 527; *Rednock v. Westmoreland Coal Co.*, 132 Pa. Superior Ct. 89, 200 A. 114; *Zuro v. McClintic Marshall Co.*, 129 Pa. Superior Ct. 143, 195 A. 160; *Savolaine v. Matthew Leivo & Sons et al.*, 131 Pa. Su-

perior Ct. 508, 512, 200 A. 243; *Brown v. State Workmen's Insurance Fund et al.*, 131 Pa. Superior Ct. 226, 228, 200 A. 174, and kindred cases. See also Skinner's Pennsylvania Workmen's Compensation Law, 3d Ed. p. 471.

It has been repeatedly held that the amount specified in paragraph (c) to be paid for the permanent injuries therein enumerated "includes all incapacity to labor that may be connected therewith, whether it be total, partial or no incapacity at all." In *Croll v. Miller*, supra, this court said: "If anything has been settled it is that the extent of disability, incapacity to labor, or loss of earning power, consequent upon the destruction, or permanent loss of the use, of any of the members of the body enumerated in section 306(c) is wholly immaterial. In the case of some employees, the loss of a leg or an arm may entirely destroy their earning power depending upon the kind of work for which they are fitted, their age, temperament, and other circumstances, while in others the loss of a member may not cause any diminution in their earning power."

After an appeal had been taken by the employer from the action of the board to the common pleas, the writer of the opinion for the board, Commissioner Swaney, apparently realizing the findings would not support the award, filed a so-called clarifying opinion, concluding with the following additional finding: "The claimant has suffered the loss of the industrial use of his left foot and in addition to the loss of the industrial use of his left foot he has other disabilities resulting from the injury. All the testimony as we can see shows that this claimant is totally disabled not only by reason of having lost the industrial use of his left foot, but that the other disabilities he is suffering from at this time are the result of the injury. Therefore, he is entitled to compensation for total disability."

This finding is seriously defective in that it contains

no specification of the "other disabilities." As the return of the record for specific findings would cause undue delay, we shall proceed to a final disposition of the case.

From what has already been said it is clear that the question of law involved upon this appeal is whether there is any competent evidence upon this record supporting a finding that any organ or organs of any part of claimant's body, other than his left foot, have been so injured, deranged or affected, as a direct result of the injury to his foot, as to cause a disability separate, apart and distinct, from the pain, inconvenience and incapacity to labor normally following and incident to the injuries accidentally inflicted upon his foot.

Upon examination of the testimony we find that the four medical experts, above named, agree upon two fundamental propositions in the case. Although claimant (whose age does not appear upon the record) worked as a laborer for a company engaged in the construction of steel freight cars from 1926 to 1929 and as a trackman for appellant until the date of the accident, without loss of time from illness, the doctors agree he was not in sound health when injured. It is not questioned by any of the doctors that claimant had a preexisting physical condition which rendered him more susceptible to an injury of the kind here shown than an entirely normal person would have been. Dr. Seibert, who as a consulting surgeon for appellant treated claimant immediately after the accident and continuously since that date, testified he had been afflicted since birth with a defective circulatory system, due to a lack of balance in the "vaso-motor system which controls the dilation and contraction" of his blood vessels. This circulatory disturbance Dr. Seibert said was evidenced by the fact that when claimant's foot "was in a dependent position it would become red, and when elevated it became waxy white."

After stating that the circulatory changes were present in claimant's *right* foot in the winter of 1933 and also in both *hands* during the winter of 1936, his testimony continued: "Q. What is this circulatory disturbance to which you refer? A. In our opinion it is in the classification of the Berger's Disease, so-called, but in this individual's case the vaso-motor unbalance which goes along with the make-up of this particular individual. This man shows a lot of congenital neurological stigmata showing he has congenital lateral nystagmus, (involuntary oscillation of the eyeballs). His ectoderm, from which his skin, etc. is derived, is unusual. His nervous system, which is derived from the same source, is very unstable. His circulatory system, as far as the vaso-motor is extremely unstable, which can be seen very easily by anybody. In other words, he is an individual, who has a physical and nervous make-up, who would have just such a circulatory system and disturbance as this individual has. Q. Is the lay expression for Mr. McClelland's condition—an Albino? A. This man is not a real Albino—he is bordering on that classification—lack of pigment in the skin layers. We looked at this man's eyes. The eye grounds have very little pigment in them and a real Albino has no pigment in the retina. He has a little. He does not stand strong light. He is that type of individual. It is part of the developmental condition of his body. Q. Do I understand, doctor, that such a condition, such things as light hair and lack of pigment in the skin and eyes, is a condition which develops in the embryo state? A. Right. Q. And it develops from the same portion of the embryo from which the nervous system is developed? A. Correct. Q. And therefore this claimant has an unusual nervous set-up? A. He certainly does. Q. Is there any connection, or relation between the circulatory condition to which you have referred and his nervous set-up? A. We believe it is directly respon-

sible for the circulatory changes in all of his extremities. Q. In what way? A. Due to the instability of the nervous control of the vessels."

With relation to the extent of the injuries to claimant's foot and the history of his case, the witness testified: "Q. Will you tell us what the condition of the foot was [immediately after the accident]? A. He had a swelling over the dorsum of his foot extending up to the lower part of his ankle. This was due to hematoma, or collection of blood beneath the skin. The skin was not broken. No bone injury is evident by Xrays taken on April 1, 1933, or subsequent pictures. ...... Q. Just tell us what the history of his case was following that time? A. He remained in the hospital from April 1, 1933 until April 14, 1933, at which time the swelling had disappeared. He still had some soreness in his foot. He was allowed to go home and returned to see us. Subsequently after his discharge his foot seemed somewhat better for a while and then he began to complain of pain in the foot radiating up along the internal malleolus and up into the calf of the leg. Later on, as he returned to us, he complained of a lot of pain in the third and fourth toes, which had not been injured at all directly." As respects the progress of the circulatory condition, Dr. Seibert's testimony reads: "Q. When did you first notice this condition in the right foot? A. The circulatory changes were present in the fall of 1933 in the right foot. There was, however, no pain at that time. In the winter of 1933, he developed pain in his right foot as well as his left foot although the pain was more severe in his left foot than in his right foot."

The witness further stated that during the entire winter of 1936 claimant "had all these circulatory changes, with associated pain quite severe in both of his feet and both of the hands."

None of the other doctors differed in any way with these statements by Dr. Seibert.

Another proposition upon which the medical experts agree is that, by reason of the then existing condition of the blood vessels of claimant's foot, the accident resulted in the loss of its use.

Dr. Seibert said the injury to the foot increased the pain in that member to such an extent that claimant had lost "the industrial use" of it.

Dr. R. M. Christie, claimant's family physician, testified: "Q. What is your opinion as to the cause of the existing condition in his left foot? A. I feel there is no question but what Mr. McClelland has a definite nervous circulatory condition and I also feel that the *disability of his left foot* has been either *caused* or *aggravated* by the injury. I base this on the fact that I knew him quite well previous to his injury and knew him never having any trouble." (Italics supplied)

In the cross-examination of this witness we find these questions and answers: "By Mr. Evans (Counsel for appellant): Q. Doctor, what is the nervous circulatory condition which you have found in his left foot? A. I feel that he has a disturbance of the circulation in the left foot which is evident on examination. The foot flushes in a dependent position and vanishes quickly when elevated. However, he has circulation in the foot which is evidenced by the fact that he has a pulse in the dorsal pedus portion of that foot, *but find it difficult for me to determine on the outside, as to whether the injury caused the disturbance of circulation,* or whether it was due to a general neurological disease. Q. That was the troublesome factor? A. Yes. (Italics supplied) ...... By the referee: Q. Does his disability go above the knee? A. In my opinion, it did not go above the ankle from his description of it to me. It was on the bottom of the foot, on the inner

surface of the foot about to the point of the internal malleolus."

Dr. J. M. Dunkle, another physician called by claimant, examined him about two weeks before the hearing. His opinion was thus expressed: "Q. In your opinion then, what has brought on the present disability in the left foot? A. The injury we might say has caused this [circulatory disturbance] to become local in that foot. . . . . . Q. Would that injury make that condition local, or general? A. A direct injury to the vessels in that part of the body would cause it to remain as a local condition, while the shock might cause it to exist in a general way and after the shock had subsided, I think the *condition remains as a local condition at present.*" (Italics supplied)

Dr. J. O. Donaldson, the third doctor called by claimant, saw him first in February of 1936 and repeatedly thereafter. In his direct examination this witness expressed the positive opinion that the injury aggravated the existing condition in claimant's left foot.

In reply to the question, "What is your professional opinion as to the cause of disability in his left foot?" the witness said: "I believe in this case that the injury has made the condition, and the condition worse in his left foot for this reason—in his hands, when he had this trouble, both hands were the same. He has the same vaso-motor condition in his feet. In the foot where he has had the injury, that foot is a lot worse, yet the hands both show the same. I believe that the injury made the condition *worse in that left foot.*" (Italics supplied)

Claimant's own description of his physical condition at the time of the hearing reads: "Q. Where is your pain at this time? A. All in my left foot between my three lower toes. The nerves have drawn ever since the rail hit that foot. Q. In your second, third and fourth toes? A. Yes, and until Dr. Seibert removed

the head of this metatarsal bone, I could not walk unless these bones gritted together, and after that I had relief. Q. Does it hurt you to walk on that left foot? A. It certainly does ...... Q. Are you able to stand for any length of time? A. If I am careful what I do, I can get around some, but to amount to anything, I am completely all in. If I walk around these streets very much—well it makes me sick the way my foot hurts me. Q. Do you have severe pain in that foot all the time? A. Continually. When I raise it up, it does not hurt as bad as down. ...... By the referee: Q. Aside from this pain that you have in your left foot, do you have any other discomfort? A. All I have is the left foot and when I was suffering otherwise I had went and took herb medicine. My nerves were wrecked, and when I got relaxed I was all right but if I had kept on, I would have been passed getting out of. Q. Do you have any nervous disorder now? A. Only in my left foot, and if I get out and do too much I get nervous from the pain from my foot."

Clearly there is nothing in any of this testimony which would sustain any award except one under Section 306(c) for the loss of the use of the foot; its whole tendency is to negative any suggestion that any other part of claimant's body has been injuriously affected by anything except the normal progress of his congenital lack of balance in his vaso-motor system.

Counsel for claimant contends, however, that there is competent additional evidence upon the record supporting a finding that, in the language of his brief, "claimant's entire nervous system has been thrown out of balance by the trauma suffered in the left foot and that the shock to the nerves of the left foot has brought about disturbance to the circulatory system throughout [his] entire body." This contention, of course, ignores the fact, conceded by all of claimant's experts, that the circulatory system of his entire body has never

been in balance. Aside from that fact, our search of the record has failed to disclose any testimony, measuring up to the latest standard prescribed by the Supreme Court, which would support the assertion of claimant's counsel.

Dr. Seibert expressed his opinion that even if claimant had not received the injury of March 31, 1933, he would have been incapacitated by the time of the hearing—four years later—through the normal progress and development of his disease, which by that date affected all his extremities in some degree. As to any connection between the trauma and claimant's general condition at the time of hearing Dr. Seibert testified: "Q. Is such a circulatory condition caused by trauma? A. It is not. Not in the opinion of anybody that I have ever read, on this condition—not an infectious basis. Q. Not produced by bacteria? A. It is not in the consensus of opinion of anybody I have ever heard, or read."

Upon the question of a possible causal connection between the injury to claimant's left foot and the disabling conditions in his right foot and both hands, the witness testified: "Q. Doctor, is there any possibility of this trauma that Mr. McClelland suffered to his left foot having anything to do with the complaint he has had at times in his right foot and two hands? A. Could not possibly be—in his right foot and hands. ...... By Mr. Markel (Counsel for claimant): "Q. Did the injury to the left foot have anything to do with the nervous disorder and the circulatory disease in the left foot? ...... A. My own opinion is that traumatism has nothing to do with this and that is the basis of the opinions of all individuals who have written extensively on this vascular condition."

We have referred above to Dr. Christie's opinion that the disability from the accidental injury "did not go above [claimant's] ankle." Reference has also been

made to the opinion of another witness called by claimant, Dr. Dunkle, that the injury caused the circulatory disturbance to become localized in his left foot.

The only other medical expert through whom claimant undertook to speak was Dr. Donaldson, and as we understand the brief for claimant great reliance is placed upon Dr. Donaldson's testimony. Emphasis is put upon the following portions: "Q. In your opinion the part that trauma played has increased the difficulty in his left [hand?] foot? A. Yes. Q. Pain in the left foot now? A. Yes. Q. On walking, or standing? A. Yes. Q. Trouble is the loss of the industrial use of the left foot? A. Right. ...... By Mr. Markel: Q. Is there anything peculiar in the fact that these present disorders were not evident prior to the accident and the fact that they started in immediately after the accident? ...... A. You wish to know if the accident has anything to do with the bringing of this on? I believe that it was probably a predisposing factor that brought the thing on. That is hard to answer. The accident *could* be a predisposing condition to bring it on. It was a nervous shock to his system which brought it on. Whether it would come eventually it is hard to say. By the referee: Q. Are you referring to this condition in his foot? A. No, I meant the condition of his hands and uninjured foot." (Italics supplied)

Later in his testimony Dr. Donaldson thus expressed an opinion that the shock of the injury to his foot *"could* easily" have unsettled claimant's "sympathetic nervous system": "Q. This trauma to this foot did not affect the general sympathetic nervous system? A. Absolutely—by unbalancing the entire nervous system. He never had symptoms before and the shock could easily have upset the entire nervous system and started this up. Q. In your opinion, this trauma was a trauma to the entire sympathetic system? A. It was a disturbing thing—a predisposing thing that unsettled the

sympathetic nervous system. His nervous system was hanging in the balance, as it were, and something came along to knock it off."

Even if we assume, without deciding, that mere aggravation of a pre-existing physical condition by one of the permanent injuries listed in paragraph (c) of Section 306, without proof of the destruction of or injury to any specific organ or organs, could be made the basis of an award under paragraphs (a) or (b), the foregoing qualified statement that the accidental injury was *probably,* or *could* be, a "predisposing thing that unsettled [claimant's] sympathetic nervous system," was subsequently so weakened by Dr. Donaldson's further testimony as to render it incompetent to support any finding of a "complete causal connection" (*Lente v. Luci,* supra) between the permanent injury and claimant's "unsettled" nervous system. We refer to the following statements of the witness: "Q. The trauma was something that had a local effect particularly? A. Right, the shock and the condition *may* have brought on his general condition. Q. Is that as far as you can go? A. Yes, I would not say it would not have come on *eventually* anyhow." (Italics supplied)

Under *Elonis v. Lytle Coal Co.,* 134 Pa. Superior Ct. 264, 3 A. 2d 995, and the cases therein considered, such testimony is legally insufficient to sustain a finding of causal connection.

We have quoted, at perhaps undue length, from the medical testimony for the purpose of demonstrating that this record is barren of any competent evidence sustaining the award upon which the judgment was entered. Giving claimant the benefit of every reasonable inference from the testimony it boils down to this. If we lay aside the positive opinion of appellant's expert witness that the accidental injury had no effect whatever upon any portion or organ of the physical structure of claimant's body, except his left foot, and in no

way contributed to or aggravated the disabling, congenital, circulatory condition with which he is afflicted, and accept at its face value the testimony by and on behalf of claimant we have this situation. Claimant testified that at the time of the hearing "all [his] pain was in [his] left foot" and that he then had no "nervous disorder" except that "if [he] got out and did too much [he] got nervous from the pain from [his] foot." Of his three medical witnesses, one said his disability from the injury did not extend above his ankle, another that the trauma caused his circulatory disturbance to be localized in his foot, and the third that the shock of the accident *could* or *may* have been a "predisposing thing that unsettled [claimant's] sympathetic nervous system."

Under such testimony the case is clearly ruled against claimant by the above cited cases of *Lente v. Luci, O'Donnell v. South Fayette Twp. Dist. et al., Croll v. Miller,* and *Casper v. State Workmen's Insurance Fund,* and distinguished from such cases as *Clark v. Clearfield Opera House Co.,* supra; *Gardner v. Pressed Steel Car Co. et al.,* 122 Pa. Superior Ct. 592, 186 A. 410, and *Toth v. Pittsburgh Terminal Coal Corp.,* 110 Pa. Superior Ct. 163, 167 A. 438, in each of which there was competent evidence of definite injuries to parts of the body, other than one of the members specified in paragraph (c) of Section 306, directly connected with the permanent injury.

There is no doubt, under the evidence, that the unfortunate claimant, as a result of the injury to his foot, suffers inconvenience and pain in that member severe enough to produce, upon its use, nervousness and exhaustion, and to incapacitate him for work, but the legislature has seen fit to provide that for "all disability resulting from" the amputation or "permanent loss of the use" of a foot "the compensation shall be exclusively" the amount specified in paragraph (c) of Sec-

tion 306. As appellant has paid him more than the compensation there fixed, its exceptions to the additional award should have been sustained and judgment entered in its favor.

Judgment reversed and here entered for appellant.